## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**, **IOWA CITIZENS FOR COMMUNITY IMPROVEMENT**, **BAILING OUT BENJI**, **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**, and **CENTER FOR FOOD SAFETY** | **CASE NO.  4:17-cv-362** |
| Plaintiffs, | |
| v. | **CIVIL RIGHTS COMPLAINT** |
| **KIMBERLY K. REYNOLDS**, in her official capacity as Governor of Iowa, **TOM MILLER**, in his official capacity as Attorney General of Iowa, and **BRUCE E. SWANSON**, in his official capacity as Montgomery County, Iowa County Attorney, | |
| Defendants. | |

**COME NOW** Plaintiffs **Animal Legal Defense Fund**, **Iowa Citizens for Community Improvement**, **Bailing Out Benji**, **People for the Ethical Treatment of Animals**, and **Center for Food Safety**, (hereinafter Plaintiffs), by and through their attorneys, Rita Bettis of the American Civil Liberties Union of Iowa, Professors Justin Marceau Alan Chen of the University of Denver Sturm College of Law, of counsel to the Animal Legal Defense Fund, Matthew Liebman of the Animal Legal Defense Fund, Matthew Strugar of the Law Office of Matthew Strugar, Paige M. Tomaselli of the Center for Food Safety, and David S. Muraskin and Leslie A. Brueckner of Public Justice, P.C., and respectfully allege as follows:

**INTRODUCTION**

1.     This lawsuit challenges the constitutionality of Iowa's "Ag-Gag" law, Iowa Code

§ 717A.3A, which criminalizes undercover investigations at factory farms and slaughterhouses.

These investigations reveal animal cruelty, unsafe food safety practices, environmental hazards,

and inhumane working conditions.  At the behest of the animal agriculture industry, nine states

have passed Ag-Gag laws.  These are Kansas, Montana, North Dakota, Iowa, Utah, Missouri,

Idaho, North Carolina, and Arkansas.  Ag-Gag bills have been introduced in dozens more

states. Federal courts have already invalidated Ag-Gag laws as violations of free speech in Idaho

and Utah.

2.     In the early 1900s, Upton Sinclair became a household name for exposing the

unfair labor practices, cruelty to animals, and unsanitary conditions of meat processing plants,

and his exposé led to the enactment of landmark federal food safety legislation, including the

Federal Meat Inspection Act and the Pure Food and Drug Act.

3.     In the last decade, journalists and animal protection advocates have continued

Sinclair's legacy, conducting more than eighty undercover investigations at factory farms in the

United States, virtually all of which would be criminalized by the Iowa statute.  Without

exception, each investigation has exposed horrific animal suffering and many led to food safety

recalls, citations for environmental and labor violations, evidence of health code violations, plant

closures, criminal animal cruelty convictions, and civil litigation.  Such investigations have

resulted in thousands of news stories and have made invaluable contributions to national

conversations on matters of significant public concern.

4.     One such undercover, employment-based investigation at a Hormel Foods

supplier in Iowa revealed multiple beatings of pigs with metal rods and workers sticking

clothespins into pigs' eyes and faces.  A supervisor was filmed kicking a young pig in the face, abdomen, and genitals to make her move and told the investigator, "You gotta beat on the bitch. Make her cry."[1]

5.     Another investigation at a slaughterhouse in Iowa revealed the horrific treatment of cows, some of whom remained conscious for as long as two minutes after their throats had been slit.  The same facility had previously been cited for violations of occupational safety laws and child labor laws.[2]

6.     In passing Iowa's Ag-Gag law, the legislature intended to prevent such investigations with the force of criminal penalties.  And it has succeeded.  In the years leading up to the passage of the Ag-Gag law in 2012, there were at least ten undercover investigations in Iowa.  Since the law's passage, there have been zero.

7.     Undercover investigations in the animal agriculture industry are typically employment-based: investigators obtain a job through the usual channels, then document activities in the facility through a hidden camera while performing the tasks required of them as employees.  When obtaining employment, investigators actively or passively conceal their investigatory motive, as well as their affiliations with journalistic or advocacy groups.

8.     The law has gagged critics of industrial agriculture by creating the viewpoint-based crime of "agricultural production facility fraud."  The law makes it a crime to "obtain[] access to an agricultural production facility by false pretenses" or "make[] a false statement or

---

[1] People for the Ethical Treatment of Animals, *Mother Pigs and Piglets Abused by Hormel Supplier*, https://investigations.peta.org/mother-pigs-piglets-abused-hormel-supplier  (last visited Oct. 10, 2017).

[2] People for the Ethical Treatment of Animals, *PETA Reveals Extreme Cruelty at Kosher Slaughterhouse*, https://www.peta.org/features/agriprocessors/ (last visited Oct. 10, 2017).

representation" on an employment application "with an intent to commit an act not authorized by the owner" of the facility.  Iowa Code § 717A.3A(1)(a)-(b).

9.      In its intent and operation, the law eliminates undercover investigations at agricultural facilities because the use of false pretenses and misrepresentations are essential tools for conducting undercover journalism and public interest investigations.  If investigators were required to disclose that they were engaging in an undercover investigation or affiliated with the press or public interest organizations, as the Iowa law requires, they would never be allowed to enter the facilities.

10.     Moreover, the statute defines "agricultural production facility" so broadly that it applies not only to factory farms and slaughterhouses, but also to any "crop operation property" or any location "agricultural animals" are maintained, including exhibitions, markets, and even vehicles. Iowa Code § 717A.1(2)-(4), (5)(a).

11.     The Ag-Gag law even applies to "puppy mills," facilities that breed large numbers of dogs in inhumane conditions for the pet trade.  The law defines "agricultural animal" to include "[a]n animal that is maintained for its parts or products having commercial value," as dogs bred for the commercial pet trade are.  Iowa Code § 717A.1(4).  Commercial dog breeders in Iowa are regulated by the Iowa Department of Agriculture and Land Stewardship, further evidence that they are "agricultural animals."  Iowa Code § 162.8.

12.     Advocacy groups estimate that Iowa currently has approximately 250 puppy mills. While the conditions at many of these facilities are unknown, at least 15 have been cited for causing extreme animal suffering, such as forcing the animals to live in filthy conditions, providing no protection from extreme heat and cold, and having severely injured or sick dogs with no adequate veterinary care.

13.     Despite the fact that Iowa is home to a large number of abusive puppy mills, there are currently no laws that require inspections of these facilities, which makes undercover investigations the only reliable way to expose these conditions.  Moreover, advocacy groups can no longer rely on the U.S. Department of Agriculture's inspection reports because of the Agency's recent decision to remove these reports from its website.  Due to the backlog of requests under the Freedom of Information Act, these records are estimated to take months or years to obtain, making it nearly impossible to determine the current conditions of these facilities.

14.     The Iowa Ag-Gag law is part of the animal agriculture industry's nationwide campaign to silence the undercover investigations and corresponding media coverage that contribute to public debate about animal treatment and food safety.

15.     In August 2015, the U.S. District Court for the District of Idaho struck down Idaho's Ag-Gag law as unconstitutional under the First and Fourteenth Amendments.  Like Iowa's Ag-Gag law, Idaho's Ag-Gag law criminalized obtaining employment through misrepresentation.[3] In July 2017, the U.S. District Court for the District of Utah struck down Utah's Ag-Gag law as unconstitutional under the First Amendment.  Like Iowa's Ag-Gag law, Utah's Ag-Gag law criminalized obtaining employment through false pretenses.[4]  In September 2017, the U.S. Court of Appeals for the Tenth Circuit reversed a federal district court in Wyoming and held that Wyoming's Ag-Gag laws—also known as "Data Trespass laws"— violated the First Amendment.[5] Like Iowa's Ag-Gag law, Wyoming's Data Trespass laws

---

[3] *Animal Legal Defense Fund v. Otter*, 118 F. Supp. 3d 1195, 1201 (D. Idaho 2015).

[4] *Animal Legal Defense Fund v. Herbert*, No. 2:13-CV-00679-RJS, 2017 WL 2912423 (D. Utah July 7, 2017).

[5] *W. Watersheds Project v. Michael*, 869 F.3d 1189 (11th Cir. 2017).

criminalized undercover investigations into potential violations of environmental, food safety, and animal cruelty laws.  Each of these decisions recognized the critical difference between generally applicable trespass or fraud laws, and laws that single out certain types of trespass or fraud for increased criminal sanction because of a purpose to limit certain types of whistleblowing speech.

16.     Plaintiffs bring this action to prevent the enforcement of Iowa's Ag-Gag law, Iowa Code § 717A.3A.[6]

---

[6] The statute reads as follows: 717A.3A AGRICULTURAL PRODUCTION FACILITY FRAUD.

1. A person is guilty of agricultural production facility fraud if the person willfully does any of the following:

> a. Obtains access to an agricultural production facility by false pretenses.

> b. Makes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized.

2. A person who commits agricultural production facility fraud under subsection 1 is guilty of the following:

> a. For the first conviction, a serious misdemeanor.

> b. For a second or subsequent conviction, an aggravated misdemeanor.

3. a. A person who conspires to commit agricultural production facility fraud under subsection 1 is subject to the provisions of chapter 706. A person who aids and abets in the commission of agricultural production facility fraud under subsection 1 is subject to the provisions of chapter 703. When two or more persons, acting in concert, knowingly participate in committing agricultural production facility fraud under subsection 1, each person is responsible for the acts of the other person as provided in section 703.2. A person who has knowledge that agricultural production facility fraud under subsection 1 has been committed and that a certain person committed it, and who does not stand in the relation of husband or wife to the person committing the agricultural production facility fraud under subsection 1, and who harbors, aids, or conceals the person committing the agricultural production facility fraud under subsection 1, with the intent to prevent the

17.     Iowa Code § 717A.3A is both facially content-based and predicated on a

viewpoint-based legislative purpose.  The statute is exclusively targeted at undercover

investigations conducted at agricultural facilities in order to prohibit the development and release

of information critical of agricultural production practices.  It is facially unconstitutional and

unconstitutional as-applied to the Plaintiffs in this case.

18.     The legislative history and context for the law, detailed below, leaves little doubt

that the legislative purpose was to punish animal rights groups and curtail a form of political

speech of great public concern.

19.     Several of the Plaintiffs are parties that conduct these investigations and have a

concrete desire to engage in speech and expressive conduct that violate the Ag-Gag statute.

Other Plaintiffs rely on the investigations for their reporting, research, and educational outreach

to contribute to an important public debate about mass-produced agricultural products.  The Ag-

Gag law also harms Plaintiffs because as long as it remains enforceable Plaintiffs will be

compelled to divert resources from their core missions in order to engage in outreach and

education about the Ag-Gag law. Plaintiff CCI also suffers a direct injury because its mission

relating to educating the public about the reality of factory farming in Iowa is impeded.

20.     In addition, because the law is motivated by animus towards a politically

unpopular group—animal protection advocates—it also violates the Fourteenth Amendment.

---

apprehension of the person committing the agricultural production facility fraud under
subsection 1, is subject to section 703.3.

b. A trial information or an indictment relating to agricultural production facility fraud
under subsection 1 need not contain allegations of vicarious liability as provided in
chapter 703.

21.     In short, the Iowa law infringes the rights of Plaintiffs and gives the agriculture industry a virtual monopoly on the most relevant and probative speech on a topic that is of vital importance to the public, thereby allowing the industry to provide a misleading account of its activities and hide violations of animal cruelty, labor, environmental, and food safety laws.

22.     Accordingly, Plaintiffs ask this Court for declaratory and injunctive relief to preserve their right and the right of others to engage in expressive and communicative activity that is of the utmost public concern.

## JURISDICTION AND VENUE

23.     This action arises under the U.S. Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

24.     This Court has authority to grant the declaratory and injunctive relief herein requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

25.     Venue is proper in the U.S. District Court for the Southern District of Iowa pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

### Plaintiffs

26.     Plaintiff ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit animal protection organization founded in 1979 that uses education, public outreach,

investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food.  ALDF's work is supported by more than 200,000 members and supporters across the country, including in Iowa.  ALDF promotes the humane treatment of farmed animals.  ALDF and its agents have conducted undercover investigations at animal facilities around the country, including facilities that would meet the definition of an "agricultural production facility" under Iowa Code § 717A.1(5)(1).  ALDF would like to conduct an investigation at an agricultural production facility in Iowa, has conducted animal welfare investigations in Iowa before, and has a professional working relationship with a licensed private investigator in Iowa.  Moreover, ALDF's core mission of improving the lives of animals is fundamentally impaired by the Ag-Gag law.  ALDF uses investigations to support its litigation and outreach, and this law directly impedes these efforts by diminishing the supply of such investigations.  ALDF also spends significant resources to prevent the spread of unconstitutional Ag-Gag laws, including the one enacted in Iowa.  These expenditures to counteract the unconstitutional violations of various persons' civil rights constitute a harmful diversion of ALDF's very limited resources and a loss to the organization because those resources would otherwise be better spent furthering ALDF's core mission of protecting the lives and advancing the interests of animals through the legal system.  ALDF, however, is obligated to divert its resources in order to prevent the harm Ag-Gag laws, like and including the one enacted in Iowa, pose to ALDF's core mission because such laws prevent the creation and dissemination of information that protects the lives and advances the interests of animals, and because such laws directly impede the improvement of animals' status in the law.

27.     Plaintiff IOWA CITIZENS FOR COMMUNITY IMPROVEMENT (CCI) is a statewide Iowa non-profit organization that works to enable Iowans from all walks of life—

urban and rural, young and old, immigrants and lifelong Iowans—to make change in their communities by raising their voices and doing grassroots advocacy.  They have approximately 4,200 dues paying members around the state, in addition to another 17,000 supporters and activists who sign up to receive CCI emails, take action online, attend meetings, sign petitions, and engage in other forms of activism with and for CCI.  Many of their members are workers in agricultural facilities, through which CCI would be able to engage in undercover investigations and engage in evidence collection through false pretenses in order to support its advocacy mission, were it not for the Ag-Gag law.  Their motto is "People Before Politics. People Before Profits. People Before Polluters."  Their organizational priorities include fighting factory farms and protecting Iowa's clean water and environment, as well as advancing for worker justice, racial justice, and immigrants' rights.  They work to organize workers, and have specifically worked in the past to organize in hog facilities.  In 2015, they worked with Latino workers in an egg and poultry facility who had been forced to pay for their own protective gear.  CCI did not engage in undercover investigations as part of that advocacy, and did not collect footage of conditions for workers inside that facility, out of fear of criminal liability imposed by Iowa's Ag-Gag law.  Prior to the Ag-Gag law, CCI's members—who were workers in targeted facilities— would collect photographic evidence of poor or unsafe working conditions.  Those photos were key components of the OSHA complaint that CCI members, who were Latino farmworkers, filed in 2012 against Angola Pork LLC, a factory farm near Algona, which resulted in citations and notifications of penalty by the agency to Angola Pork later that year.  In that case, the ability for CCI, through its members, to obtain photographic evidence undercover while under the pretense of simply being workers showing up for duty, was critical to the citations, which included serious violations for failing to furnish facilities that were "free from recognized hazards that

were causing or likely to cause death or serious physical harm" to employees.  In addition, CCI

utilizes video and images in its online and in-person activism, including online petitions and

other forms of advocacy.  For example, when they believe illegal dumping into Iowa waterways

or other violations of the Clean Water Act are occurring, they have been chilled from obtaining

video evidence of those violations.  Because of the fear of criminal prosecution imposed by the

Ag-Gag law, CCI and its members do not collect those images or video by gaining access to

agricultural facilities, and are limited to what documentation and images are viewable from

public property.  This necessarily severely limits what documentation and images are available

for use in CCI's advocacy.  At a time when the Iowa Department of Natural Resources has been

underfunded by the legislature and is understaffed to investigate and respond to citizen

complaints of spills or dumping, CCI views the availability of those tools as never more

important to its mission.

    28.    Plaintiff BAILING OUT BENJI is a small Iowa non-profit organization that

works to protect companion animals and raise the public's awareness about various animal

welfare issues impacting dogs. It is specifically concerned about puppy mills.  In 2011, the

organization's founder, Mindi Callison, first learned about Iowa's problem puppy mills and the

conditions some dogs and puppies face in large animal breeding facilities, including lack of

human interaction, unsafe and unsanitary conditions, lack of veterinarian care, and exposure to

rain, snow, extreme heat, and extreme cold.  Outraged and motivated to change things in Iowa,

she founded Bailing Out Benji.  Prior to the passage of the Ag-Gag law, the organization

conducted its own investigations into puppy mills, including on an undercover basis by using

false pretenses to gain access to facilities and used images and video obtained by them and by

others in their public presentations.  For example, Bailing Out Benji volunteers would use false

pretenses to gain access to those auctions, either by stating overtly or by letting the assumption

go uncorrected, that they were breeders or brokers, when in fact, their intent was not to purchase

dogs, but to document expose practices that they view as abusive, and then rescue the dogs.

Since the Ag-Gag law was signed into law, however, they no longer engage in undercover

activities for fear of prosecution.  Similarly, prior to the Ag-Gag law, Bailing Out Benji would

use images and video obtained through undercover investigations conducted in Iowa by another

animal welfare organization, Companion Animal Protection Society (CAPS), in their public

education activities.  Now, because of the chilling effect of Ag-Gag, CAPS no longer produces

undercover materials of puppy mills in Iowa, and, as a result Bailing Out Benji can no longer use

these materials in its advocacy.  Finally, one of the ways in which Bailing Out Benji

accomplishes its mission is by exposing which puppy mills pet stores in Iowa are purchasing

puppies from as well as the conditions of those puppy mills.  Without the materials produced

through undercover investigations, they are unable to engage in that work as effectively, or at all,

for fear their activities would constitute "harbor[ing], aid[ing], or conceal[ing] the person

committing the agricultural production facility fraud under subsection 1, with the intent to

prevent the apprehension of the person committing the agricultural production facility fraud" if

they failed to disclose that they work for an animal advocacy organization.

      29.     Plaintiff PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.

(PETA) is a Virginia non-stock corporation and animal protection charity exempt from taxation

pursuant to Section 501(c)(3) of the Internal Revenue Code.  PETA is dedicated to protecting

animals from abuse, neglect, and cruelty, and undertakes these efforts through public education,

undercover investigations, research, animal rescue, legislation, special events, celebrity

involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals.  A

central tenet of PETA's mission is to expose cruelty to farmed animals, educate the public about such cruelty, and encourage people to choose a lifestyle that does not involve or support abuse, neglect, or exploitation of animals.  PETA has conducted dozens of investigations in the United States over the past three decades, exposing illegal animal abuse and turning the results of each investigation over to appropriate law enforcement and/or regulatory authorities.  It continues to conduct these investigations to expose further illegal conduct on the part of workers and management personnel.  PETA is also interested and willing to conduct an investigation in Iowa but for the threat of criminal prosecution under Iowa Code § 717A.3A.   Specifically, PETA has conducted such investigations in Iowa before the passage of the Ag-Gag and is interested in conducting an employment-based undercover investigation in Montgomery County following PETA's receipt of a whistleblower report of animal mistreatment at a Montgomery-based egg farm.  PETA would attempt to conduct an employment-based undercover investigation at the Montgomery County facility but for the Ag-Gag statute.  Moreover, PETA uses investigations to support its litigation and outreach and this law directly impedes these efforts by diminishing the supply of such investigations.  The Ag-Gag law impairs PETA's ability to carry out its core mission and has forced PETA to divert resources toward educating the public regarding and otherwise opposing Ag-Gag laws, like that enacted in Iowa.  PETA has and will continue to divert resources to engage in educational outreach about Iowa's Ag-Gag law, and the money spent opposing and doing outreach regarding Ag-Gag laws diminishes the money available for these more traditional, core educational goals of PETA.

30.     Plaintiff CENTER FOR FOOD SAFETY is a 501(c)(3) non-profit environmental and consumer advocacy organization that empowers people, supports farmers, and protects the earth from the harmful impact of industrial agriculture.  Through legal, scientific, and grassroots

action, CFS protects and promotes the public's right to safe food and the environment.  CFS has

over 900,000 members nationwide, including 5,211 members in Iowa.  CFS's industrial animal

agriculture program uses regulatory action, citizen engagement, litigation, and legislation to

promote transparency and accountability in the animal agriculture industry.  Through this work,

the program aims to reduce the harmful impacts of industrial animal facilities on animal welfare,

the environment, and human health and to increase consumer awareness, availability, and

accessibility of suitable alternatives by highlighting humane, organic, and pasture-based animal

raising practices and producers.  Since 2009, CFS's industrial animal agriculture program has

developed expertise and multi-faceted strategies on addressing the known impacts of intensive

animal confinement on food safety and public health.  Unconstitutional Ag-Gag laws frustrate

CFS's mission to protect the earth from the harmful impact of industrial agriculture because they

prevent CFS from disseminating information about the conditions at animal production facilities

to their members, impede the transparency in agriculture that CFS promotes, and encourage the

continuation of the harmful, inhumane, industrial animal agricultural model. CFS has spent

significant resources to stop unconstitutional Ag-Gag laws and promote transparency in animal

agriculture. But for these unconstitutional Ag-Gag laws, CFS would utilize its limited resources

promoting alternatives to the industrial animal raising system. CFS also disseminates to

government agencies, members of Congress, and the general public a wide array of

informational materials addressing the harmful effects of industrial agriculture.  These materials

include news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets.

CFS relies on and uses videos and recordings obtained during undercover industrial agriculture

investigations for its legal, policy, advocacy, and educational and outreach work.  The Iowa Ag-

Gag law impedes on CFS's ability to carry out its work because it cannot disseminate information concerning the animal agricultural industry in Iowa.

## Defendants

31.    Defendant KIMBERLY KAY REYNOLDS is the Governor of Iowa and as such, is the Chief Executive for the state, responsible for ensuring the enforcement of the State's criminal statutes. The Governor is sued in her official capacity.

32.    Defendant TOM MILLER is the Attorney General of Iowa and as such, oversees the enforcement of the State's criminal statutes by the Iowa Attorney General's Office, including yearly coordination of training with Iowa county attorneys who prosecute the state's criminal statutes in all of Iowa's 99 counties.  The Attorney General is sued in his official capacity.

33.    Defendant BRUCE E. SWANSON is the County Attorney of Montgomery County, Iowa, the site of an egg farm where PETA would conduct an undercover investigation in response to a 2017 whistleblower complaint, but for the Ag-Gag law.  As county attorney, Mr. Swanson is primarily responsible for the enforcement of criminal laws in Montgomery County, Iowa by acting as prosecuting attorney on behalf of the State of Iowa.  Mr. Swanson is sued in his official capacity.

## FACTUAL BACKGROUND

### Statutory Overview

34.    On March 2, 2012, former Governor Terry Branstad signed into law House File 589, codified at Iowa Code § 717A.3A.

35.    Iowa Code § 717A.3A created the new crime of "agricultural production facility fraud."

36.    An "agricultural production facility" is "an animal facility as defined in [Iowa

Code § 717A.1(5)(a)] or a crop operation property."  Iowa Code § 717A.1(3).

37.     Iowa Code § 717A.1(5)(a) defines an "animal facility" as "a location where an agricultural animal is maintained for agricultural production purposes, *including but not limited to a location dedicated to farming as defined in section 9H.1, a livestock market, exhibition, or a vehicle used to transport the animal.*" (Emphasis added.)

38.     An "agricultural animal" is defined as "[a]n animal that is maintained for its parts or products having commercial value, including but not limited to its muscle tissue, organs, fat, blood, manure, bones, milk, wool, hide, pelt, feathers, eggs, semen, embryos, or honey," as well as equines. Iowa Code § 717A.1(1).

39.     The code defines "agricultural production" as "any activity related to maintaining an agricultural animal at an animal facility or a crop on crop operation property."  Iowa Code § 717A.1(2).

40.     The statute creates two forms of agricultural production facility fraud:

    a.     "Obtain[ing] access to an agricultural production facility through false pretenses." Iowa Code § 717A.3A(1)(a).

    b.     "Mak[ing] a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized."  Iowa Code § 717A.3A(1)(b).

41.     Persons violating Iowa Code § 717A.3A(1)(a) or (b) face up to a year in jail and up to $1,875 in fines for a first conviction, or up to two years in jail and up to $6,250 for a second conviction. Iowa Code § 903.1(1).

42.    The threat of criminal liability extends beyond the individual who conducts the investigation and includes non-profit organizations such as ALDF and PETA that coordinate and promote such investigations.  The statute includes liability for those who conspire to violate the Ag-Gag law, as well as those who aid and abet violations.  Iowa Code § 717A.3A(3)(a).  Indeed, even a journalist who refused to reveal a source who provided news obtained through an undercover investigation would be a criminal, because the law also makes liable anyone "who harbors, aids, or conceals" someone who has violated the Ag-Gag law.  *Id*.  Under the plain terms of Iowa Code § 717A.3A, no new investigations of the type contemplated by some of the Plaintiffs and relied on by other Plaintiffs may be conducted in Iowa.

**Statutory Purpose**

43.    Iowa Code § 717A.3A criminalizes obtaining access to an agriculture production facility by false pretenses.

44.    Iowa Code § 717A.3A criminalizes employment-based investigations where employment is obtained through misrepresentation or omission.

45.    By criminalizing the obtaining of access through false pretenses, the statute is ensuring that no recordings or images are captured by individuals who may portray the agricultural industry in a negative light.

46.    Because the Ag-Gag law criminalizes misrepresentations made with "an intent to commit an act not authorized by the owner of the agricultural production facility," Iowa Code § 717A.3A(b), including undercover recording, the statute in effect prohibits and singles-out images and recordings that will portray the agricultural industry in a negative light.  The purpose

17

and effect of the statute is to prioritize and privilege speech that is favorable to the agricultural industry and to prevent speech that is unfavorable to the agricultural industry.

47.     The statute criminalizes the production of speech that is a matter of considerable public concern.

48.     The statute's legislative history demonstrates that it was introduced with the explicit intent of silencing or impeding speech by animal protection organizations.

49.     In debating the Ag-Gag law, Iowa legislatures confirmed that the central objective of the law is to prevent whistleblowers from collecting information about animal agriculture and distributing it to the public.

50.     Representative Sweeney stated: "I feel it is wrong to absolutely like to get a job to try to defame the employer." The law, however, only applies to agriculture, rather than all employees in Iowa generally.

51.     Senator John P. Kibbie of Emmetsburg, president of the State Senate, commented to the New York Times that he supported the legislation to "make producers feel more comfortable."

52.     Speaking about the bill, Senator Tom Rielly of Oskaloosa told the Sioux City Journal that animal rights activists "want to hurt an important part of our economy . . . . These people don't want us to have eggs; they don't want people to eat meat . . . . What we're aiming at is stopping these groups that go out and gin up campaigns that they use to raise money by trying to give the agriculture industry a bad name."

53.     A spokesman for Governor Terry Branstad told the same outlet that the governor "believes undercover filming is a problem that should be addressed."

54.     Senator Joe Seng, a proponent of the bill and the Senate Agriculture Committee Chair, stated: "I really think [the bill] is an attempt to protect agriculture, but not have any subversive acts to bring down an industry."

55.     When asked whether he believes that the industry can police itself and protect the animals against abuse, Senator Seng said: "I think the bill that we passed is mainly for protection of industry that is dedicated to actually feeding the world in the next 25 years."

56.     Senator Seng stated: "It's my job as Ag Chair to support agriculture."

57.     Cody McKinley, a public policy director for the Iowa Pork Producers Association and a supporter of the Ag-Gag bill, stated: "I don't believe in people being hired under false pretenses to get access to these facilities to portray their side of the story."

58.     Bruce Berven, lobbyist for the Iowa Cattlemen's Association, argued that animal rights organizations are interested in something other than ensuring humane treatment of animals.  He stated: "[The animal activists'] agenda is clear and basically anti-livestock.  They are basically just using this issue to promote their vegan-slash-vegetarian agenda.  There's a bigger war going on than this issue."

59.     A vice president for the National Pork Producers Council, Pat McGonegle, stated that factory farms "need protection from people who have mischievous intentions and this does just that."

60.     Dave Warner, the Director of Communications of the National Pork Producers Council faulted the undercover investigations because they time their exposés to correspond to "a good news cycle."

61.     The history, text and structure of the law also confirm that the law was intended to suppress speech that is negative to the agricultural industry.  On information and belief, the law

was introduced in response to past investigations in the state, it has the effect of criminalizing essentially every undercover investigation that has occurred in Iowa, and it even criminalizes journalistic decisions to keep confidential the source of an exposé.  Iowa Code § 717A.3A(3)(a).

62.     On information and belief, the Iowa Ag-Gag law was drafted and enacted just over a year after a major factory farm investigation of the Iowa Select Farms.

63.     Upon information and belief, certain legislators and legislative staff advocated for Iowa Code § 717A.3A specifically because it would silence animal protection organizations.

64.     On information and belief, there are no other statutes in Iowa that target a specific category of whistleblowing or investigative journalism. Undercover investigations of, for example, financial institutions or medical providers are still permitted.

65.     Moreover, laws prohibiting fraud, trespass, adulteration of food products, and theft of trade secrets already exist in Iowa.  *See*, *e.g.*, Iowa Code §§ 714.8-714.13 (criminal fraud); 189A.10 (fraudulent practices in meat and poultry inspection); 716.7-716.8 (trespass); 190.3-190.9, 190.15 (adulteration of food); §§ 550.3-550.4 (theft of trade secrets).

### Investigations and Reporting Generally

66.     Plaintiff ALDF has engaged in, and intends to continue to engage in, undercover investigations of agricultural facilities in the United States.  ALDF conducts investigations because they are useful to the organization's legal advocacy, as well as its educational and outreach missions.

67.     Plaintiff PETA regularly conducts investigations into industrial factory farming facilities and slaughtering operations in the United States, including previous investigations in Iowa.  These investigations are central to the organization's mission and related public interest campaigns.

68.    PETA's employment-based investigations at Postville, Iowa's Agriprocessors cow slaughter facility in 2004 and 2008 revealed painful and grossly inadequate slaughter techniques that left cows conscious for as long as two minutes after their throats were slit.  The investigations resulted in a six-month investigation by the Department of Agriculture and changes to the facilities' slaughter practices.[7]

69.    Another 2008 PETA employment-based investigation at a farm outside of Bayard, Iowa that supplied pigs to Hormel showed multiple beatings of pigs with metal rods and workers sticking clothespins into pigs' eyes and faces.  A supervisor was filmed kicking a young pig in the face, abdomen, and genitals to make her move and told the investigator that when he gets angry or a sow won't move, "I grab one of these rods and jam it in her [anus]."[8]  The investigation resulted in 22 charges of livestock neglect and abuse filed against six of the facility's former employees.

70.    Gaining employment or access to an agricultural production facility in Iowa would make one guilty of a serious misdemeanor.  Thus, ALDF and PETA are precluded from gaining access to the facilities.  ALDF is a legal organization with a Criminal Justice Program that provides free legal assistance and training to law and enforcement prosecutors, while PETA

---

[7] *See* Alan Cooperman, *USDA Investigating Kosher Meat Plant; Advocacy Group's Grisly Video Sparked Outcry*, Washington Post (Dec. 31, 2004), http://www.washingtonpost.com/wp-dyn/articles/A37569-2004Dec30.html [last visited Oct. 10, 2017]; Julia Preston, Kosher Plant Is Accused of Inhumane Slaughter, New York Times (Sept. 4, 2008), http://www.nytimes.com/2008/09/05/us/05immig.html [last visited Oct. 10, 2017].

[8] See People for the Ethical Treatment Animals, Mother Pigs and Piglets Abused by Hormel Supplier, https://secure.peta.org/site/Advocacy?cmd=display&page=UserAction&id=1131 (last visited Oct. 10, 2017); Graphic Abuse of Pigs Caught on Tape, CBS News (Sept. 17, 2008), https://www.cbsnews.com/news/graphic-abuse-of-pigs-caught-on-tape/ (last visited Oct. 4, 2017).

has often worked with law enforcement to ensure the prosecution of animal cruelty on factory farms and elsewhere.  Neither organization would intentionally violate a criminal law.

71.    On information and belief, agricultural employers in Iowa inquire about whether a potential employee has any connections to an animal protection organization.

72.    Industry documents for the agricultural field routinely instruct agricultural employers to inquire about affiliations with animal protection organizations.

73.    During their investigations, investigators use recording equipment to document violations of applicable laws and regulations, including unsanitary practices, cruelty to animals, pollution, sexual misconduct, labor law violations, and other matters of public importance.

74.    Plaintiffs ALDF and PETA have used the videos and photos of illegal conduct obtained through undercover employment-based investigations to seek enforcement of civil and criminal laws and regulations, to encourage legislative and industry reform, to educate the public about factory farms, and to effectuate changes in corporate policies and supply chains.

75.    Because ALDF and PETA are not able to conduct undercover investigations in Iowa as a result of the Ag-Gag law, gathering these videos and photos is impossible.

76.    PETA's 1998 investigation of Belcross Farm, a pig-breeding factory farm in North Carolina, resulted in felony indictments of workers after PETA released hours of video footage that revealed shocking, systematic cruelty from daily beatings of pregnant sows with a wrench and an iron pole to skinning pigs alive and sawing off a conscious animal's legs.  A 2001 PETA investigation of Seaboard Farms, an Oklahoma pig farm, resulted in the first conviction for felony animal cruelty to farmed animals after PETA's investigation showed employees routinely throwing, beating, kicking, and slamming animals against concrete floors and bludgeoning them with metal gate rods and hammers.  PETA's 2008 investigation of the factory

farms of Aviagen Turkeys resulted in the first-ever felony indictments for farmed poultry, and first convictions of factory farmers for abusing turkeys.

77.     ALDF's 2016 investigation of a Nebraska pig breeding operation owned by The Maschhoffs, the nation's third largest pig producer and a Hormel Foods supplier, revealed long-term neglect and lack of appropriate veterinary care, with pigs suffering for days or weeks with grossly prolapsed rectums, intestinal ruptures, large open wounds, and bloody baseball-sized ruptured cysts.  Pigs were denied food for long periods of time, and a botched "euthanasia" resulted in a mother pig slowly dying after being shot in the head multiple times over the course of several minutes.  Hormel suspended the supplier after ALDF's release of the investigation. Another ALDF investigation in 2015, of a Carthage, Texas-based Tyson Foods chicken slaughterhouse, showed birds treated like trash, left to suffocate by the hundreds on overcrowded conveyor belts and discarded, still alive, in heaps of dead and dying chickens, feathers, and filth. That investigation resulted in the filing of complaints—concerning the treatment of chickens, food safety, worker protection, and false corporate statements—with several federal and state agencies.

78.     Undercover investigations have and will continue to result in positive legal outcomes, provide insights into modern factory farming, and contribute immensely to public discourse about the political and ethical dimensions of our food choices.

79.     These exposés are an important part of the marketplace of ideas because they influence public opinion and consumer demand.  A 2012 consumer survey conducted by Purdue University's Department of Agricultural Economics and Department of Animal Sciences found that the public relies on the information gathered and presented by animal protection groups and investigative journalists more than they rely on industry groups and the government combined.

80.     With the exception of material generated by or done on behalf of the animal

agricultural industry, or pro-agriculture speech produced by the State, investigations by

journalists or activists and their subsequent coverage in the media provide the primary avenue

through which the workings of agricultural operations may be gleaned.

81.     Existing employees in the agricultural industry almost never become

whistleblowers, due to a lack of legal protections for whistleblowers in the industry, employees'

often-precarious socioeconomic and immigration status, and the likelihood of retaliation from

co-workers or management.  As a result, undercover employment-based investigations by

advocacy organizations or journalists are the only available means of exposing the truth about

what happens inside factory farms and slaughterhouses.  Plaintiffs are aware of no exposés by

non-investigatory or "bona fide" employees in Iowa before or since the passage of the Ag-Gag

law.

82.     Countless reporters and authors have sought access to factory farms and

slaughterhouses by asking owners for tours in order to better understand modern industrial

agriculture.  Owners and managers of these facilities virtually never give such consent.  The

acclaimed author Jonathan Safran Foer, who spent three years researching agriculture for his

book *Eating Animals*, wrote, "As it turns out, locked doors are the least of it. I never heard back

from . . . any of the companies I wrote to. . . . Even research organizations with paid staffs find

themselves consistently thwarted by industry secrecy. . . . The power brokers of factory farming

know that their business model depends on consumers not being able to see (or hear about) what

they do."

**Investigative Injuries (ALDF, CCI, BAILING OUT BENJI, and PETA)**

83.     Plaintiffs ALDF, CCI, BAILING OUT BENJI, PETA, and CFS, have the goal and organizational purpose of producing speech that shows the hidden side of industrial animal agriculture.

84.     ALDF and PETA have a specific interest in agricultural investigations in Iowa, which leads the nation in industrial animal agriculture.  Iowa is by far the country's biggest producer of pigs raised for meat.  More than 20 million pigs are raised on Iowa farms each year, more than twice as many as the country's number two producer, North Carolina (which also has an Ag-Gag law).  A majority of these pigs are born into the industry by breeder sows who are confined in "gestation crates," a form of intensive confinement that causes immense animal suffering and has been banned in several states.

85.     Iowa is also the country's biggest egg producer, with more than 45 million hens raised on Iowa farms each year.  The vast majority of these hens are kept in "battery cages," a form of intensive confinement that causes immense animal suffering and has been banned in several states.

86.     In addition to its prominent role in pig and egg production, Iowa farms also raise millions of other animals for meat or other animal products, including cows, turkeys, and sheep.

87.     There are more than 250 slaughterhouses and processing plants in Iowa.

88.     Given Iowa's prominent role in animal agriculture, ALDF and PETA have a strong desire to conduct undercover investigations at facilities in the state.

89.     Plaintiffs ALDF and PETA's missions are best served by demonstrating that meat, dairy, eggs, and related products are produced in a similar manner industry-wide, across

the United States, which requires the ability to access a diverse array of states and not just a select few. This requires constantly seeking investigative opportunities in different states.

90.     The inability to conduct undercover investigations in Iowa allows agricultural enterprises in Iowa to claim that they are treating their animals in a way that is different than what is shown in the videos obtained by Plaintiffs from other states. Food safety, labor, and animal welfare issues are uniquely hidden from public scrutiny because of the Iowa Ag-Gag law.

91.     ALDF has identified agricultural production facilities where it would seek to conduct undercover, employment-based investigations, but it has not pursued employment at those facilities due to its reasonable fear of prosecution under the Ag-Gag law. ALDF would retain a licensed investigator to conduct an undercover, employment-based investigation at an agricultural production facility in Iowa, but has refrained from doing so due to its reasonable fear of prosecution under the Ag-Gag law.

92.     Since Iowa passed the Ag-Gag law in 2012, at least 15 whistle-blowers have contacted PETA alleging cruel or inhumane treatment of animals at Iowa agricultural facilities, including pig farms, chicken farms, egg farms, dairy farms, fur farms, and cow slaughterhouses. Because of the threat of criminal liability under the Ag-Gag law, PETA was unable to conduct an employment-based investigation at any of these facilities.

93.     The investigations desired by ALDF and PETA would violate the Ag-Gag statute, Iowa Code § 717A.3A. A typical applicant applies for employment with the primary motive of obtaining a job in exchange for a wage. An ALDF or PETA applicant with an *investigatory* motive would obtain the job under what the statute would consider the false pretense of being a typical applicant, thus violating subsection (a) of the Ag-Gag statute, even without making an affirmative misrepresentation.

94.     ALDF applicants would also violate subsection (b) by making affirmative misrepresentations during the employment process with the intent of video recording the conduct of the facility, even where the facility does not authorize such recording.  Those misrepresentations would include omitting investigators' affiliations with animal protection organizations, omitting their status as licensed private investigators (where applicable), downplaying their educational background, and telling innocuous white lies to ingratiate themselves to their interviewers, such as "I like your tie (or local sports team or company philosophy)."

95.     PETA applicants would also be considered to violate subsection (b) by making what the statute terms "affirmative misrepresentations" during the employment process by omitting their animal protection affiliations and by video recording what is believed to be illegal conduct at the facility, even where the facility does not authorize such recording.

96.     As a matter of policy, ALDF and PETA instruct their employees and agents not to exaggerate their qualifications for a position, such as by purporting to have skills, licenses, or clearances that they do not in fact have.

97.     The misrepresentations that ALDF intends to make are "downward" lies to misdirect attention from, for example, a journalism degree or animal rights background, rather than "upward" lies to exaggerate qualifications, such as claiming to have experience with a particular piece of machinery or a certification to drive a forklift.

98.     ALDF and PETA instruct their investigators to undergo the same training and perform the same lawful tasks as any other employee, including respecting all biosecurity protocols.

99.     The camera worn by investigators is hidden on the clothing and runs automatically; it does not interfere with the investigator's ability to perform the tasks required of the position.

100.    In terms of efficiency and productivity, the investigator is no different from any other employee.

101.    Plaintiffs reasonably believe that prosecutors in Iowa intend to enforce Iowa Code § 717A.3A.

102.    The Ag-Gag law creates a paradox.  When Plaintiffs' undercover investigators come across extreme animal cruelty or serious violations of food safety, labor, environmental laws, they are more likely to receive more media attention, and will be more likely to be prosecuted under Iowa Code § 717A.3A.  The more significant the exposé the more likely a prosecution.

103.    ALDF and PETA would like to investigate one or more facilities in Iowa, but their constitutionally-protected speech is chilled because of the reasonable fear of prosecution under Iowa Code § 717A.3A.  They cannot engage in their investigative activities without fear of prosecution in Iowa.  They have taken steps to find a suitable investigator but cannot take further actions to obtain agricultural employment because of Iowa Code § 717A.3A.

104.    Realistically, there is no investigation strategy that would meaningfully reveal the conditions inside agricultural production facilities without violating the statute.

105.    Plaintiff CCI has likewise been harmed by the Ag-Gag law. For example, prior to the passage of Ag-Gag law, CCI's members who were workers at the Angola Pork, LLC facility collected photos of workplace safety violations that became key components of CCI's 2012 OSHA complaint that resulted in citations and notifications to the facility.  But under the chill of

Ag-Gag, CCI's members are unable to obtain evidence undercover.  In addition, CCI, which utilizes video and images in its online and in-person activism, including online petitions and other forms of advocacy, is unable to obtain or utilize documentary evidence of illegal dumping into Iowa waterways or other violations of the Clean Water Act—and are limited to what documentation and images are viewable from public property.

106.    Plaintiff Bailing Out Benji is harmed because since the Ag-Gag law took effect, it is unable to gain access to puppy mills or dog auctions on agricultural facilities by either posing as purchasers, breeders, or brokers either by stating so overtly or by letting the assumption go uncorrected, in order to investigate, document, and advocate against unsafe or inhumane practices in its work to protect dogs and puppies.

### Organizational Injuries (ALDF, PETA, CFS, CCI, and Bailing Out Benji)

107.    ALDF, PETA, CFS, CCI, and Bailing Out Benji are each forced to divert money or organizational resources away from their core educational and outreach programs to focus on the social harms of Ag-Gag laws.  The existence of Iowa Code § 717A.3A forces each organization to do public outreach and education about Ag-Gag laws generally, including Iowa's, and as such they have less money and time to devote to outreach on topics that are central to their missions, such as animal rescues, educating the public about the harms of industrial farming, and other forms of abuse, neglect, and cruelty to animals.

108.    ALDF, PETA, CFS, CCI, and Bailing Out Benji are each harmed because the law hinders their outreach and educational programs.

109.    ALDF and PETA use their own investigations and those of other groups to file lawsuits and promote legislation to further their missions of protecting animals.  They also use investigations to document the problems with the legal system's treatment of animals, such as the absence of federal laws that protect animals on farms or the under-enforcement of state anti-cruelty laws.  Iowa Code § 717A.3A all but forecloses investigative accounts of the agricultural industry, creating an information vacuum that directly undermines the Plaintiffs' litigation, legislation, outreach, and educational programs.

110.    CFS relies on and uses videos and recordings obtained during undercover industrial agriculture investigations for its legal, policy, advocacy, and educational and outreach work.  For example, CFS was involved in litigation in Texas to enforce the state's Health and Safety Code at egg production facilities with the goal of protecting the public from contracting foodborne illnesses.  The lawsuit stemmed in part from an undercover investigation that revealed unsanitary and inhumane conditions at a Texas facility.  CFS is a uniquely-situated recipient of the undercover recordings as it is a listener; without access to undercover recordings CFS has difficulty fulfilling its mission and providing information to the public about food production at agricultural operations.

111.    CFS has imminent plans to rely on undercover investigations to pursue legal and policy work as part of its campaign against concentrated animal feeding operations.  The reasonable fear of foodborne illnesses from certain agricultural facilities, the difficulty in obtaining information, and the inability to protect the public from environmental and public health threats of certain agricultural operations are themselves actual injuries.

112.    Plaintiff Bailing Out Benji is unable to utilize information, images, video obtained through undercover investigations of puppy mills in Iowa in their public education activities,

because the chilling effect of Ag-Gag has led the cessation of the gathering of those materials by Companion Animal Protection Society and others.  Bailing Out Benji is similarly unable to send volunteers to dog auctions to document practices they view as abusive and rescue dogs, because gaining access to the facilities and information would require posing as dog breeders or brokers, under the threat of prosecution posed by Ag-Gag.

113.    Plaintiff CCI also suffers a direct injury because it is hindered in its mission to educate the public about the harms of factory farming to workers and the environment.  Under Ag-Gag, it is unable to acquire and use in its advocacy efforts information or documentary evidence which was obtained in an undercover manner due to the chill of Ag-Gag.

114.    Iowa has a track record of having animal agricultural facilities that have caused major outbreaks of foodborne illnesses.  For example, in June of 2017 the owners of Quality Egg LLC—an egg company based in Iowa—pleaded guilty to federal food safety violations stemming from a nationwide salmonella outbreak that sickened more than 56,000 people in 2010.  Moreover, the U.S. Department of Agriculture sanitation reports from the packing facility at Wright County Egg farm in Iowa show inspectors noted the presence of bugs 30 times in the three months leading up to the salmonella.

## CLAIMS FOR RELIEF

### Declaratory Relief

115.    An actual and immediate controversy exists between Plaintiffs and Defendants. Plaintiffs contend that the challenged statute is unconstitutional. Defendants believe the statute is constitutional.

116.    Plaintiffs are therefore entitled to a declaration of rights with respect to this controversy.  Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

### Injunctive Relief

117.    Plaintiffs are entitled to an injunction. Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights.  Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute.  Plaintiffs have no plain, adequate, or speedy remedy at law.  Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

### FIRST CAUSE OF ACTION

### (First Amendment: Content & Viewpoint Based Discrimination)

118.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

119.    The Ag-Gag law is a content-based restraint on constitutionally-protected speech on a matter of significant public concern; it is not narrowly tailored to a compelling government interest.

120.    The most important function of the First Amendment is to protect against laws that target certain messages or speech because of their "ideas, subject matter, or content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95–96 (1972).

121.     "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).

122.     The Ag-Gag law is content-based on its face because it prohibits false pretenses and statements, but not true ones.

123.     The Ag-Gag law is content-based because it applies only to speech involving a single industry—agricultural production.

124.     The Ag-Gag law is content-based in both intent and effect, because it was passed with the legislative motive of eliminating undercover, employment-based investigations by animal rights groups into factory farms and other agricultural production facilities.

125.     The improper, speech-suppressing purpose behind the law is also revealed by examining the impact of the law, the historical background for the enactment, and the legislative history.

126.     The Supreme Court has recognized that misrepresentations, like those criminalized by the Ag-Gag law, are constitutionally protected, so long as they do not invade a legally cognizable interest.  *United States v. Alvarez*, 132 S. Ct. 2537, 2545 (2012).

127.     The Ag-Gag law is not narrowly tailored because Iowa already has laws protecting the interests that purportedly motivated the legislature—laws protecting privacy, prohibiting trespass, and promoting biosecurity.  The only "harm" not accounted for by existing law is the embarrassment and political fall-out suffered by the agriculture industry when otherwise-legal undercover investigations paint the industry in a negative light.  Shielding an industry from criticism cannot be considered a legitimate, much less a "compelling," government interest.

128.    Even if the speech in question is not generally protected speech—for example, if the speech in question is merely cast as trespassing—the State still may not make a content-based distinction.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992).  That is to say, content-based distinctions are impermissible even for speech that is generally unprotected.

129.    The State has not limited the ability to engage in whistleblowing activity in other highly regulated or important industries, including medical providers, defense contractors, banks, or childcare providers.

130.    By singling out the agricultural industry for protection against political speech that may be harmful to its profits, the Ag-Gag law must be treated as a content- and viewpoint-based regulation.  In practice, the law ensures that only one side of the debate about industrial agricultural facilities is raised.

131.    The Ag-Gag statute, as a content- and viewpoint-based regulation that is neither justified by a compelling interest nor narrowly tailored, violates Plaintiffs' First Amendment rights.

132.    In August of 2015, the United States District Court for the District of Idaho ruled that a similar statute in Idaho infringed on the First Amendment, granting summary judgment for the plaintiffs.  *Animal Legal Def. Fund v. Otter,* 118 F. Supp. 3d 1195, 1199 (D. Idaho 2015).

133.    The Idaho statute, I.C. § 18-7042(1)(d), also contained a provision criminalizing misrepresentation by job applicants.  The Idaho District Court stated that this statute "seeks to limit and punish those who speak out on topics relating to the agricultural industry, striking at the heart of important First Amendment values.  The effect of the statute will be to suppress speech by undercover investigators and whistleblowers concerning topics of great public importance:

the safety of the public food supply, the safety of agricultural workers, the treatment and health

of farm animals, and the impact of business activities on the environment." *Id.* at 1201.

134.    In July 2017, the United States District Court for the District of Utah declared

Utah's Ag-Gag law, which prohibited gaining access to agricultural facilities through

misrepresentation, unconstitutional under the First Amendment.  *Animal Legal Def. Fund v.*

*Herbert*, No. 2:13-CV-00679-RJS, 2017 WL 2912423 (D. Utah July 7, 2017).  The court held

that the kinds of lies at issue are constitutionally protected by the free speech clause, and that the

lying prohibition was a content-based restraint on speech that was not narrowly tailored to a

compelling government interest.  *Id.* at *6-10, 12-15.

135.    In its opinion, the Utah District Court also recognized that the proliferation of Ag-

Gag laws was a concerted effort by the animal agriculture industry to silence its critics that was

not limited to Utah.  In doing so, the court specifically mentioned the Iowa Ag-Gag law, noting

that Iowa passed its Ag-Gag law in the wake of an investigation into horrific animal suffering at

an egg farm.  The court observed that "[a]ccording to its sponsors the [Iowa] bill's purpose was

'to crack down on activists who deliberately cast agricultural operations in a negative light and

let cameras roll rather than reporting abuse immediately,' and to stop 'subversive acts' that could

'bring down the industry,' including acts committed by 'extremist vegans.'"  *Id.* at *3.

136.    In September 2017, the U.S. Court of Appeals for the Tenth Circuit ruled that

Wyoming's two "Data Trespass" Ag-Gag laws, Wyo. Stat. §§ 6-3-414 and 40-26-101—which

banned collection of data on public lands if the data collector has to traverse private lands—

infringed on speech protected by the First Amendment.  *W. Watersheds Project v. Michael*, 869

F.3d 1189 (11th Cir. 2017).  The court explained that "The [statutes] regulate protected speech

under the First Amendment and that they are not shielded from constitutional scrutiny merely because they touch upon access to private property."

137.   Plaintiffs are entitled to prospective relief from the Defendants to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

138.   Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the Ag-Gag law is unconstitutional and unenforceable in any situation.

## SECOND CAUSE OF ACTION

### (First Amendment: Overbreadth)

139.   Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

140.   The law in question is both technically overbroad in the sense that it violates the rights of third parties not before the court, and it is overbroad in the sense of restricting more speech than the Constitution permits.

141.   Both listeners and speakers can challenge a law as constitutionally overbroad. When a law impairs protected speech, both the would-be speakers and those who would benefit from hearing or seeing the speech are harmed.  One need not be threatening to violate Iowa Code § 717.3A in order to have a cognizable injury.

142.   Even a speaker or listener whose rights are not violated by the statute in question can raise an overbreadth challenge.  Overbreadth doctrine permits the vindication of First Amendment rights for parties not before the Court.

143.   A statute that prohibits substantially more speech than the First Amendment permits is unconstitutionally overbroad even though the State could lawfully punish some of the conduct targeted by the statute.  *See United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010).

144.    Specifically, the Ag-Gag law, although designed to target and chill animal protection activists, also criminalizes all sorts of protected speech.  Intentionally or not, the law chills and criminalizes a plethora of protected speech that is not even related to animal welfare, including that concerning worker safety, food safety, labor laws, and other types of agricultural industry misconduct.

145.    The Ag-Gag law criminalizes not just the protected speech of Plaintiffs, but of any person or group that would seek to investigate an "agricultural production facility" in a similar manner, including employees, journalists, or any person merely concerned about the conditions under which food is processed.

146.    Because the Ag-Gag law categorizes so much protected speech as "criminal," it is unconstitutionally overbroad.

147.    Plaintiffs are entitled to prospective relief enjoining Defendants from enforcing the Ag-Gag law.

148.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the Ag-Gag law is unconstitutionally overbroad and unenforceable in any situation.

### THIRD CAUSE OF ACTION

### (Fourteenth Amendment: Equal Protection & Due Process)

149.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

150.    The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  Equal

Protection and Due Process generally prohibit laws that impinge on fundamental rights, including freedom of speech.

151.    When a statute is enacted based on improper motives, including animus towards a particular group of people, the Equal Protection and Due Process Clauses of the Fourteenth Amendment are violated.  *See, e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

152.    The motivating purpose behind Iowa Code § 717A.3A was animus towards animal rights groups.

153.    A substantial motivating purpose for the enactment of Iowa Code § 717A.3A was to harm a politically unpopular group and shelter a single industry from political discourse and criticism.

154.    Iowa Code § 717A.3A targets animal protection groups.  The legislative history is replete with statements from legislators claiming that the purpose of the law is to prohibit a whistleblower from gaining access to factory farms.  The history and impact of the statute confirms and redoubles this illicit motive.

155.    Iowa already has laws that protect the interests that purportedly motivated the legislature—laws protecting privacy, prohibiting trespass, and promoting biosecurity.  The only "harm" not accounted for by existing law is the embarrassment and political fall-out suffered by the agriculture industry when otherwise-legal undercover investigations expose animal cruelty, unsanitary environments, and labor code violations inside factory farms.

156.    Iowa Code § 717A.3A also substantially burden's Plaintiffs' exercise of a fundamental right—namely, freedom of speech, in violation of the Due Process Clause of the Fourteenth Amendment.

157.     Plaintiffs are entitled to prospective relief from the Defendants to remedy the Equal Protection and Due Process violations.

158.     Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the Ag-Gag law is unconstitutional.

## PRAYER FOR RELIEF

Plaintiffs respectfully request an order and judgment:

1.     Declaring that the challenged statute, Iowa Code § 717A.3A (2012), violates the U.S. Constitution on its face and as applied to Plaintiffs;

2.     Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the challenged statute;

3.     Striking down the challenged statute in its entirety;

4.     To ensure that the public has accurate notice of the requirements of the law and the Iowa Code, and to ameliorate past harm and prevent further chilling of protected speech, requiring the Defendants to provide public notice, including in the official and online editions of the Iowa Code, that Iowa Code § 717A.3A is unconstitutional;

5.     Awarding the Plaintiffs reasonable attorneys' fees and costs; and

6.     Awarding any such relief as the Court may deem just and proper.


Dated this 10th Day of October, 2017

/s/ Rita Bettis
Rita Bettis, AT0011558
ACLU OF IOWA FOUNDATION, INC.
505 Fifth Ave., Ste. 901
Des Moines, IA 50309–2316
Telephone:  515.243.3988

Fax: 515.243.8506
Email:  Rita.Bettis@aclu-ia.org

Professor Justin Marceau, (*Pro Hac Vice
application pending*)
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

Professor Alan Chen (*Pro Hac Vice application
pending*)
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-66283
achen@law.du.edu

Matthew Liebman, (*Pro Hac Vice
application pending*)
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org

Matthew Strugar (*Pro Hac Vice application
pending*)
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
matthew@matthewstrugar.com

Paige M. Tomaselli (*Pro Hac Vice
application pending*)
Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94111
(415) 826-2770
ptomaselli@centerforfoodsafety.org

David S. Muraskin (*Pro Hac Vice application pending*)
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net

Leslie A. Brueckner (*Pro Hac Vice application pending*)
Public Justice, P.C.
555 12th St., Suite 1230
Oakland, CA 94607
(510) 622-8205
lbrueckner@publicjustice.net


Attorneys for Plaintiffs