IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| ANIMAL LEGAL DEFENSE FUND, CITIZENS FOR COMMUNITY IMPROVEMENT, BAILING OUT BENJI, PEOPLE FOR THE TREATMENT OF ANIMALS, INC., and CENTER FOR FOOD SAFETY,<br>     Plaintiffs, | ) ) ) ) ) ) ) ) | No. 4:17-cv-00362—JEG |
| vs. | ) ) | |
| KIMBERLY K. REYNOLDS, in her capacity as Governor of Iowa, TOM MILLER, in his official capacity as ATTORNEY GENERAL, in his official capacity as Attorney General of Iowa, and BRUCE E. SWANSON, in his official capacity as County Attorney for Montgomery County, Iowa,<br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) | BRIEF OF *AMICI CURIAE* IOWA FREEDOM OF INFORMATION COUNCIL, and IOWA CENTER FOR PUBLIC AFFAIRS JOURNALISM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................................................2

INTRODUCTION ........................................................................................................3

ARGUMENT ..............................................................................................................4

    I.    DENYING THE GOVERNMENT THE AUTHORITY TO PUNISH UNDERCOVER INVESTIGATIONS INTO MATTERS OF PUBLIC CONCERN IS ESSENTIAL TO FREEDOM OF SPEECH AND PRESS ........................................................................4

        A.    Iowa's Ag-Gag State Exposes A Variety of Legitimate Journalism Practices to Criminal Sanctions ..........................................4

        B.    Food Safety is a Matter of Great Public Concern ...................................8

    II.    FALSE STATEMENTS OF FACT, WITHOUT MORE, ARE PROTECTED BY THE FIRST AMENDMENT ......................................10

    III.    IOWA'S AG GAG LAW CANNOT SURVIVE STRICT SCRUTINY ........................................................................................11

CONCLUSION ..........................................................................................................13

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The following *amici curiae* have individualized and collective interests in the questions presented in this case arising from their status as Iowa associations that foster and promote freedom of speech, freedom of the press, and investigative journalism.

The Iowa Freedom of Information Council is a coalition of journalists, librarians, lawyers, educators and other Iowans devoted to open government. The Council assists the Iowa Newspaper Association and the Iowa Broadcasters Association, whose members regularly report on Iowa's agriculture industry, with litigation and questions concerning open records and meetings laws.  It has advocated as *amicus curiae* on behalf of the right to free speech and a free press in cases including, *Hutchison v. Shull*, 878 N.W.2d 221 (Iowa 2016); *Bierman v. Weier*, 826 N.W.2d 436 (Iowa 2013); *Iowa Dept. of Public Safety v. Iowa District Court for Polk County*, 801 N.W.2d 544 (Iowa 2011); *Smith v. Iowa Bd. of Medical Examiners*, 729 N.W.2d 822 (Iowa 2007); *Burton v. University of Iowa Hospital & Clinics*, 566 N.W.2d 182 (Iowa 1997); *Hawk Eye v. Jackson*, 521 N.W.2d 750 (Iowa 1994); *In re Iowa Freedom of Information Council*, 724 F.2d 658 (8th Cir. 1983).

The Iowa Center for Public Affairs Journalism is an independent, nonprofit and nonpartisan news service whose mission is to build and support non-partisan investigative journalism that advances public discourse to make the world a better place.  The Center collaborates with media companies in Iowa and the Midwest, including those that focus on agriculture-related news investigations and information.

## INTRODUCTION

While a majority of Americans consume news daily[1] about the food they eat, powerful farm interests and sympathetic lawmakers have scrambled to suppress any unflattering coverage of inhumane slaughterhouse practices, unsanitary factory conditions and worker abuses through so called "ag-gag" legislation.  Rita-Marie Cain Reed & Amber L. Kingery, *Putting A Gag on Farm Whistleblowers: The Right to Lie and the Right to Remain Silent Confront State Agricultural Protectionism*, 11 J. Food L. & Pol'y 31, 36 (2015).  As these laws proliferate, their provisions intended to halt investigations of farm facilities by undercover activists and journalists have been blocked by courts mindful of the First Amendment implications.  *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1197 (9th Cir. 2018); *Also Animal Legal Def. Fund v. Herbert*, 263 F. Supp.3d 1193, 1206 (D. Utah 2017).  Defendants likewise should be enjoined from enforcing the Iowa "agricultural production facility fraud" statute, Iowa Code section 717A.3A, as it is rooted in the same fatally flawed premise as similar laws struck down by other courts:

> If the lawmakers cannot stop the presses directly, they can suppress negative information by prosecuting newsgathering activities that serve as the foundation of investigative journalism.

This notion simply cannot be squared with the First Amendment.  Undercover investigations deserve First Amendment protection as crucial building blocks to informing public debate around proper animal care and food-handling practices. Alan K. Chen and Justin Marceau, *High Value Lies, Ugly Truths, and the First Amendment*, 68 Vand. L. Rev 1435, 1473 (2015).

---

[1] Cary Funk and Brian Kennedy, *The New Food Fights: U.S. Public Divides Over Food Science*, Pew Research Center (Dec. 1, 2016) (available at www.pewinternet.org/2016/12/01/the-new-food-fights/)

## ARGUMENT

I.   **DENYING THE GOVERNMENT THE AUTHORITY TO PUNISH UNDERCOVER INVESTIGATIONS INTO MATTERS OF PUBLIC CONCERN IS ESSENTIAL TO FREEDOM OF SPEECH AND PRESS**

### A.   Iowa's Ag-Gag Statute Exposes A Variety of Legitimate Journalism Practices to Criminal Sanctions

The terms "undercover investigation" or "undercover journalism" in the agriculture sector often refer to investigations by animal advocates who make misrepresentations to secure jobs at farm facilities, then wear hidden recording devices to document conditions.  It concerns *amici* that the Ag-Gag statute prohibits these essential investigations on the basis of an individual's answers on an employment application.  Iowa Code § 717A.3A(1)(b) ("makes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility"). Equally troubling is the reality that a number of other investigative techniques – including visiting a business as a paying customer or relying on mistaken or inaccurate impressions – might also be deemed criminal under the less clearly defined Iowa Code section 717A.3A(1)(a), which prohibits obtaining access to a farm facility "by false pretenses."

These techniques, while deceptive, have an essential place in the toolbox of citizen journalists seeking to shed light on farming practices.  *See* Brooke Kroeger, *Undercover Reporting: The Truth About Deception*, 11, (2012).  Whether employed by journalists, activists, or everyday Iowans, undercover investigative techniques criminalized by the statute are an *essential* tool in revealing the kind of evidence of serious farm abuses that fuels the "uninhibited marketplace of ideas" the First Amendment was designed to foster. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969).  By suppressing these tactics, the state forecloses on the public's right to "receive information and ideas" about how the treatment and health of the animals entering the food supply. *Va. State Bd. Of Pharmacy v.*

*Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 756 (1976) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762-763 (1972)).

Upton Sinclair's heralded novel "The Jungle," which exposed filthy conditions in Chicago's meatpacking plants and led to significant reforms, was predicated on the author disguising himself as a worker and lying to gain access to infamous stockyards where he could witness conditions firsthand. Chen and Marceau, 68 Vand. L. Rev. at 1457. Undercover reporting techniques proved the only way for Sinclair to expose stockyard abuses, as even in the early 1900s meatpackers were savvy manipulators of their public image. *Id.* Any tours allowed to journalists only visited highly sanitized areas of their factories. *Id.*

Evidence suggests times have not changed the industry attitude toward transparency with the media. Mark Bittman, a New York Times food columnist, tried to arrange tours of several egg, chicken and pork producing facilities during a visit to Iowa in 2011, but was turned down or ignored by all but one hog operation. Mark Bittman, *Banned From the Barn*, N.Y. Times, July 5, 2011. The columnist arrived for his tour to find a barn that would normally hold 1,200-pigs with only 200 inside. *Id.* It smelled suspiciously like deodorant. *Id.* Bittman suspected the farm had been sanitized prior to his visit. *Id.* Despite Iowa's status as an agricultural leader, "when it comes to producing animals, zero is pretty much what you're going to see," Bittman wrote. *Id.*

Local journalists face similar roadblocks from the agriculture industry when an article demands a response to criticism of their practices. In 2014, a WHO-TV reporter sought an interview with the owners of a Jewell, Iowa dog breeding facility for a feature on a Humane Society report[2] that named the facility on a nationwide list of problem puppy

---

[2] The report noted a 2010 state inspection that revealed a six-week-old puppy whose paw was stuck under a pen wall. Other dogs had been chewing on the puppy's caught paw. *101 Puppy Mills:*

mills with histories of animal care violations.  Aaron Brilbeck, *Puppy Mill: What The Owners Are Hiding*, WHO-TV (May 7, 2014).[3]  An owner of the facility, Julie's Jewels, refused to speak with the reporter and cameraman or give them a requested tour of the breeding facility to confirm or dispel claims from the Humane Society report.  *Id.*  A man then confronted the journalists and attempted to physically block them from recording video while they stood on a nearby public roadway.  *Id.*  Julie's Jewels owners stonewalled other Iowa journalists reporting on the business, which lost its federal breeders license in 2011 following an inspection that revealed 19 violations.  Lyle Muller and Jacob Luplow, *How Things Got Out Of Hand At One Iowa Dog Breeder Inspection Visit*, IowaWatch (Oct. 11, 2014).[4]

These examples evidence why Paul Shapiro, an activist and former vice president of policy for the Humane Society, argues that "there really isn't another way to find out what's happening" inside slaughterhouses and farm facilities absent undercover investigation. Kroeger, *supra*, at 253.  When abuses become public through the results of an undercover investigation, they spark public debate necessary to spur reforms and hold industry accountable.  In November 2017, investigators with the group Direction Action Everywhere published photos and videos of dying turkeys with open sores packed on top of each other inside the cramped barns of a supplier for Utah-based turkey seller Norbest. Glenn Greenwald, *Six Animal Rights Activists Charged with Felonies for Investigation and*

---

*A Sampling of Problem Puppy Mills in the United States*, The Humane Society of the United States (May 2014) (available at www.humanesociety.org/assets/pdfs/pets/puppy_mills/101-puppy-mills-report-2014.pdf).

    [3]  Available at https://whotv.com/2014/05/07/puppy-mill-what-the-owners-dont-want-you-to-see/.

    [4]  Available at www.iowawatch.org/2014/10/11/how-things-got-out-of-hand-at-one-iowa-dog-breeder-inspection-visit/.

*Rescue that Led to Punishment of a Utah Turkey Farm*, The Intercept (May 4, 2018).[5] Norbest, which describes its turkeys as "mountain-grown" and features photos of pristine Western landscapes on its website, previously had sanctioned the supplier for failing to meet internal company standards.  *Id.*  Once activists' footage received attention in reports from the Salt Lake Tribune, CBS and Fox, the company publicly pledged to review training requirements for suppliers and inspection procedures for updates.  *Id.*  The company also reported suspending its contract with the offending' farmer.

Undercover investigations and whistleblowing by journalists and activists have proven a vital safeguard that aid state actors in their efforts.  For instance, the United States Department of Agriculture forced the Agriprocessors meatpacking plant in Postville to make corrections to its procedures after a 2008 video released by People for the Ethical Treatment of Animals showed violations of kosher slaughtering regulations.  Philip Brasher, *Postville Plant Cited for Improper Slaughtering*, Des Moines Register, Sept. 6, 2008.  In perhaps a more egregious Iowa case, prosecutors in Greene County that same year charged six farm employees with various counts of animal abuse and neglect after People for the Ethical Treatment of Animals released video footage showing workers slamming piglets against concrete floors and using metal rods to hit sows.  Henry C. Jackson, *Company: 6 Charged with Abuse No Longer Employed*, Associated Press, Oct. 24, 2008.  In California, a 2008 video made by an employee and released by the Humane Society showed immobile cows being brought to slaughter with forklifts – violating regulations designed to protect against "mad cow disease."  David Brown, *USDA Orders Largest Meat Recall in*

---

[5]  Available at https://theintercept.com/2018/05/04/six-animal-rights-activists-charged-with-felonies-for-investigation-and-rescue-that-led-to-punishment-of-a-utah-turkey-farm/.

*U.S. History*, Wash. Post (Feb. 18, 2008).  Releasing the video led to a record recall of 143 million pounds of beef prepared by the California company.  *Id.*

### B.    Food Safety is a Matter of Great Public Concern

There can be no meaningful dispute that the happenings inside agricultural production facilities are matters of public concern as demonstrated by Americans' eating habits.  The USDA projects that 2018 will be a record year for meat consumption, with the average American consumer eating more than 222 pounds of beef, pork or poultry.  Megan Durisin and Shruti Singh, *Americans Will Eat a Record Amount of Meat in 2018*, Bloomberg (January 2, 2018).[6]   American consumption of eggs is also expected to reach record levels.  *Id.*

America's significant amount of meat and animal eating carries with it the risk of exposure to a host of sickness-inducing germs that enter the food supply during processing, distribution and preparation.  *How Food Gets Contaminated – The Food Production Chain*, Centers for Disease Control and Prevention.[7]  Inattentive slaughtering can contaminate meat with any germs incubating on the animal's hide.  *Id.*  An Iowa farm was at the center of a massive recall of 550 million eggs tainted with salmonella due to deliberate actions by the company to skirt health regulations. Jason Clayworth, *Iowa Epicenter in 2010 Outbreak of Salmonella*, Des Moines Register, March 20, 2016.

Public policy questions surrounding Iowa's agriculture processing industry have long been subjects of political debate in this state.  For example, the state attorney general's alleged lax oversight of a hog confinement operator deemed to be a habitual violator of state environmental laws became a campaign trail talking point for Governor Terry Branstad in

---

[6]  Available at https://www.bloomberg.com/news/articles/2018-01-02/have-a-meaty-new-year-americans-will-eat-record-amount-in-2018.

[7]  Available at https://www.cdc.gov/foodsafety/production-chain.html.

the 2010 general election. *See* O. Kay Henderson, *Branstad, Miller debate state authority over DeCoster operations*, Radio Iowa (Aug. 31, 2010).[8]  In 2012, Governor Branstad mounted a public relations "counter-offensive" to the media's use of the term, "pink slime" to refer to beef filler.  Mike Wiser, *Branstad, team reacted quickly to 'pink slim'*, Sioux City Journal (May 6, 2012).[9]  More recently, in the last presidential election cycle, the federal government's response to Iowa's avian influenza outbreak was discussed on the campaign trail.  *See* Courtney Crowder, *Fiorina knocks feds' response to avian flu in Iowa*, Des Moines Register (July 23, 2015).[10]

The public's enduring interest in food safety and the farm industry is similarly reflected in the body of award-winning journalism on these issues.  In 1968, Des Moines Register journalist Nick Kotz won the Pulitzer Prize – journalism's highest honor – for his reporting on the meatpacking industry's unsanitary conditions that helped spur the passage of the Federal Wholesome Meat Act of 1967.  The Pulitzer Prizes, *National Reporting*.[11]  Another Des Moines Register journalist, James Risser, won a Pulitzer Prize in 1976 for his series of articles disclosing large-scale corruption in the American grain exporting trade.  *Id.*  Journalist Tony Horwitz won the prize in 1995 while at the Wall Street Journal for a series that included a piece on the fast-paced, slippery and dangerous work inside a Missouri chicken processing plant.  *Id.*  Horwitz took a job at the plant to

---

[8]  Available at https://www.radioiowa.com/2010/08/31/branstad-miller-debate-state-authority-over-decoster-operations/.

[9]  Available at https://siouxcityjournal.com/news/local/branstad-team-reacted-quickly-to-pink-slime/article_9e976732-21f3-57b5-8aa5-48032aba3f1b.html.

[10]  Available at https://www.desmoinesregister.com/story/news/elections/presidential/caucus/2015/07/23/carly-fiorina-iowa-campaign-avian-flu/30597573/.

[11]  Available at www.pulitzer.org/prize-winners-by-category/209.

report the story, omitting his bachelor's degree and masters in journalism on the employment application. *Kroeger, supra*, at 161. The above examples are but a sampling of the journalistic work produced on this issue that's spurred public debate, industry action and reform.

## II.   FALSE STATEMENTS OF FACT, WITHOUT MORE ARE PROTECTED BY THE FIRST AMENDMENT

In addition to foreclosing undercover journalism from targeting the agricultural production facilities, Iowa's Ag-Gag statute runs afoul of the First Amendment for a more basic reason.  It bears repeating that under Iowa Code section 717A.3A, a person can be convicted of agricultural facility fraud in two primary ways:  (1) obtaining access to an agricultural production facility through "false pretenses" or (2) making a false statement or representation on an employment application "with an intent to commit an act not authorized by the owner."  The United States Supreme Court, however, has been clear that falsehoods alone, absent a "legally cognizable" harm caused or "material gain" by the speaker, are protected First Amendment speech.  *United States v. Alvarez*, 567 U.S. 709, 724 (2012).  The requirement of an attendant harm is a central Constitutional protection, or "there could be an endless list of subjects the National Government or the States could single out."  *Id.*  Neither the false pretenses clause, nor the unauthorized act clause, is limited to conduct that causes a legally cognizable harm to the property owner or results in a material gain to the speaker.

On this point, the *Wasden* decision from the Ninth Circuit Court of Appeals is particularly instructive.  In *Wasden*, the court struck down Idaho's Ag-Gag statute, which criminalized entry into an agricultural production facility by "misrepresentation," because the provision alone acted to "control and suppress all false statements (related to access) in almost limitless times and settings."  *Wasden*, 873 F.3d at 1195.  As the court noted, merely

gaining access to a facility cannot be considered to cause the kinds of harm generally associated with trespass because there is no intrusion on the ownership or possession of the land at issue; consent to be there was given, regardless of whether it was granted under false pretenses. *Id.* at 1196. "Thus, the misrepresentation provision . . . regulates protected speech while 'targeting falsity and nothing more.'" *Id.* (citing *Alvarez*, 567 U.S. at 719). From *Wasden*, it follows *a fortiori* that Iowa's Ag-Gag statute similarly restricts constitutionally protected speech.

## III.   IOWA'S AG-GAG LAW CANNOT SURVIVE STRICT SCRUTINY

This Court, in its order on Defendants' motion to dismiss, already correctly determined both of the regulations plaintiffs challenge are facially content-based, as they require evaluation of the speech at issue.  (Order on Defs.' Mot. to Dismiss 21); *see also Herbert*, 263 F. Supp.3d at 1209 (D. Utah 2017) ("A law is content based – and therefore subject to strict scrutiny – if determining whether someone violated the law requires looking at what was said").  "Restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny.'" *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (quoting *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007)).  When a restriction is subject to strict scrutiny, the burden falls on the government to prove that the law is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218, 2222 (2015).

Even assuming Iowa's Ag-Gag statute is intended to further Defendants' purported interest in protecting "private property and bio-security measures/protocols," it is not narrowly tailored to achieve those ends.  The belief that gaining access to an agriculture production facility under false pretenses or making false statements to obtain employment interferes with a landowner's property interests and security is speculative at best.  For

example, a journalist who fails to disclose his or her journalism degree on a job application does not interfere with the employer's exercise of its property rights.

If Defendants believe existing laws are insufficient to protect private property and ensure bio-security, they have several alternatives that would not burden protected speech. For starters, they could amend Iowa's trespass statute, Iowa Code sections 716.7 and 716.8, to include higher penalties for transgressions occurring at agricultural production facilities. In addition, they could limit the Ag-Gag statute to transgressions that result in a legally cognizable injury to the property owner or a material gain to the offender.  Because these less restrictive alternatives are available, the Ag-Gag statute cannot stand in its current form.  *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2003) (striking down provisions in the Telecommunications Act of 1996 because of the availability of a less restrictive channel-blocking feature).

In this regard, this case presents a larger threat to our right to free press than simply suppressing undercover investigations into agricultural production facilities in Iowa. Defendants have not identified anything unique about the agricultural production industry (other than powerful lobbyists) that justifies the heightened protection afforded under section 717A.3A.  Correspondingly, Defendants cannot offer any meaningful limiting principle to its authority to criminalize undercover investigations in any other context as well.  While the hypotheticals are limitless, the threat is real.  If the Ag-Gag statute is found to comport with the First Amendment, nothing would prevent the Iowa from criminalizing the obtaining of access to any premises under false pretenses—regardless of whether the falsity interferes with the owner's property interest.  Because the statute sweeps far more broadly than necessary to achieve the Defendants' interests, it cannot survive strict scrutiny.

## CONCLUSION

WHEREFORE, the *Amici Curiae* ask this Court to grant Plaintiffs' Motion for

Summary Judgment.

Respectfully submitted,

/s/ Gary Dickey
Gary Dickey, AT#0001999
*Counsel of Record for Amici Curiae*
DICKEY & CAMPBELL LAW FIRM, P.L.C.
301 East Walnut Street, Suite 1
Des Moines, Iowa 50309
PHONE: 515.288.5008  FAX: 515.288.5010
Email:  gary@dickeycampbell.com

### CERTIFICATE OF SERVICE
I hereby certify that on July 30, 2018, I electronically
filed this document with the Clerk of Court using the
ECF system which will serve it on the appropriate
parties.

/s/ Gary Dickey